One second, I just have a couple of announcements before we start. So Judge Hull and Judge Branch and I are very pleased to be back with you in person in court today. I have just a couple of notes before we begin. One is, counsel, we are familiar with your cases, so we encourage you to jump right to the heart of your most important issues and arguments. The other is, for those of you who have not argued here before, you'll note our timing system, which I'm sure Ms. Geddes has told you about, but when the light turns yellow, you have two minutes remaining in your argument, and when the light turns red, you can finish your sentence, but we ask you to conclude your remarks. If, though, you're answering a question from the court, you may finish your answer. So I will now call our first case, which is number 20-13822, United States of America v. Moon, and we have Mr. Holmes for the appellant. Good morning. May it please the court. I propose to begin by focusing on the issue in regards to the trial court's error in denying the defendant's motion to suppress unless the court has a different preference. Proceed how you like. So this case began January 2019 with the execution of a search warrant of the defendant, Dr. Holmes, for violations of Statute 21 U.S.C. 841, which is the presence of a pill mill, and 18 U.S.C. 1347, which is a violation of health care fraud, neither of which that led to an indictment in this search. So, 50-plus agents go into the clinic looking for, specifically, the scope of the warrant was for evidence kept by the medical offices in the normal course of business that pertain to patient records, daily billing, accounts received, bank records, deposit receipts, telephone records, appointment books, and sign-in sheets that could be accessed by computers. After hours of investigation in the office, Agent Green goes into an office that the government alleges is Dr. Moon's private office, which was disputed on whether it was an office or not. And Agent Green— But that doesn't matter, does it? It doesn't. It doesn't. And can I ask you one question about the warrant? Sure. Doesn't the pill mill warrant authorized DEA agents to search for digital content, including videos? It does, Your Honor, and I'm glad you asked that question because the video recording content that they found was on a VHS tape, and that VHS tape, that technology is so obsolete that in trial, the government had to explain to the jury what this technology was. Does that matter? It does, Your Honor, because evidence by the testimony from the agent that was actually doing the investigation testified at trial that he had no reason to believe that with that antiquated technology that any of the recordings found on those VHS tapes transpired inside that clinic. So, for him to think that that VHS tape, which is kind of akin to—I mean, it's obsolete. No one uses that technology anymore. Yes, but the warrant says, and I'm reading from it, computers, digital storage media, and digital content, which may include, but not limited to, floppy disks, hard drives, tapes, DVD disks, CD-ROMs, flash drives—it goes on and on. And any other magnetic, optical, mechanical storage that can be accessed by computers to store or retrieve data. So, the warrant itself says tapes. Why don't we stop there? It's a video. It's a tape, right? There's no question it's a tape. Why is that not the end of it? It's within the scope of the warrant. Well, Justice Hall, it is a tape, but reading on into the scope of the warrant, it says accessed by a computer. There was no evidence and testimony from the agent that there was nothing there in that clinic that led him to believe that any of that was recorded at that clinic. But he's executing the warrant. The warrant specifically allows him to find these, to look for these, and that's what he did. Correct. I just don't know why we get past that. Why is he required to say, to make that determination that you're suggesting that, oh, this is obsolete, there's no way there could be anything on it. It was within the scope of the warrant. Okay. So, it's our position that with the fact that it's that old of technology and there's no device at the clinic to record that, that it was outside the scope of the warrant. Let me, I speak only for myself, but I think maybe your best argument is that Agent Green reviewed about 15 tapes. Correct. And maybe it was apparent from the first tape that this had nothing to do with the clinic. Would you elaborate on that for me? Yes, Justice Breyer, and I appreciate the question. That I was going to get to the fact that that was nothing more than exploratory rummaging because he found these tapes, originally he found 24 tapes. In totality, I think there were 60 plus tapes that were uncovered. But when he sat down and started viewing the initial 24 that were found, those 15 tapes, his testimony, when he viewed the very first tape, there was, the contents and the depictions on those tapes had nothing to do with what they were there for on the warrant. He continued 15 tapes that he viewed, and his testimony was, he continued viewing the tapes until he came across some criminality. Which means... But why, looking at our United States v. Slocum case, when a warrant authorizes the seizure of documents, an officer acting pursuant to such warrant is entitled to examine any document he discovers in order to perceive the relevance of the documents to the crime. So even if he sees one, if the first videotape he picks up has nothing that is relevant to the crime related, that is the basis of this warrant, why can't he look at 15 of them? Because one, based on his own testimony, that he realized, one, the contents on these VHS tapes were not, in his opinion, recorded at that clinic, which the purpose of that warrant was to uncover the information that was in the warrant, what they were looking for. It was evidenced by the first videotape. The second videotape... What was on the first tape? The very first tape was family videos, Justice Hull. I never... What was on it? So it would have been, I think the very first video was a recording of Christmas from, with the Moon family while they were visiting Hawaii. Was the very first videotape. And so what was the part about it that was potentially nudity or whatever? Okay, so on this, on the very first tape, there was not. There was nothing on the first? There was nothing on the very first tape. He went through 15 tapes before he encountered anything that he felt like was any kind of criminality. Okay. So it wasn't until the 15th tape is what your position is. Well, Justice Hull, before he got to 15, he did encounter, because he was rewinding, fast-forwarding and viewing these tapes, he said about a minute apiece on each VHS tape, he encountered some pornography on these that were spliced in. So for instance, there would be a tape that had the Moon family on vacation, and it would just be showing that normal, and then it would pop into something... I was trying to find out how early in the 15th did that occur? The 15th.  The 15th. So when he found the pornography on the 15th tape, he stopped? He stopped. And then they went and got a warrant? That is correct. Okay. And did he review the tapes at the place, or he took them and then reviewed them somewhere else? So the first 24 that he found, he reviewed the first 15 until he found evidence of what I got that, where did he do that? At the office, at the clinic. I thought you said there was nothing there they could view them on. View them. He could view them because it was a VHS recorder there, but record them, there was no recording devices found, and there was no allegation that there were. And his testimony was that after their investigation, there was no equipment there to actually record anything to a VHS tape at that clinic. But there was something to display it. To display it. Yes, Your Honor. You've just got a little time remaining, do you want to elaborate on any of your other arguments? Yes, Your Honor. I'm sorry, I got long-winded. So the next issue that I would like to turn to is the judge's denial of the defendant's requested jury charge. And the reason that is so crucial is because Lascivious, not only did the parties agree, but the court even agreed that the only way that this defendant could be found guilty of these charges is through Lascivious exhibition. So that term was very crucial in instructing the jury. Well, the instruction that the court gave talked about objective factors that you would look at, the context of the recording and so forth. So why doesn't that capture the point that you were trying to make in your proposed instruction? Because, Justice Pryor, it instructed the jury and gave them limited instruction on how to find Lascivious exhibition. And it almost directed them to the fact that if this defendant, personally, if this defendant felt like this was Lascivious, then they could find that this was Lascivious exhibition. So case law supports that it's not Lascivious just based on the eyes of the creator. And that jury instruction that the court gave led the jurors down a path to make the decision and to find the defendant guilty based on Lascivious exhibition and videos that contained less than one minute of any nudity. And there was no editing, there was no focusing, there was no overt act by this defendant to bring into any type of focus of any genital area to the point where in the PSR, I objected at sentencing to the reference of genitalia or vagina and the court had to stricken that from the PSR because there was none. So I'm sorry, I was about to cut you off, I was about to ask you a question. You may finish your sentence and I want you to be able to save your time for rebuttal. We felt like that the instruction that the court gave was not instructive enough for the jury to understand what they had to find for Lascivious. So how does, the court did say, because what constitutes forbidden Lascivious exhibition is not concrete. The Lascivious nature of visual depictions should be determined with respect to actual depiction themselves. Not every exposure is a Lascivious exhibition. To decide whether a visual depiction is a Lascivious exhibition, you must consider the context and setting in which the genitalia or pubic area is being displayed. How does that suggest to the jury that if Mr. Moon found it Lascivious that that's enough? The court has told the jury you have to consider the context and the setting. Well, Justice Branch, what the defense asked for was to lay out Lascivious exhibition. And based on Holmes, there was only five ways that he could be found guilty, the five prongs. And obviously the first one was not captured in any of these depictions. There was no intercourse. There was no masturbation. There was no bestiality. There was no sadistic or masochistic abuse. The only one left was Lascivious exhibition, which was very important for them to understand how they could get to that. And the Lascivious exhibition of the genital area or the genitals or the pubic area was the only course they had. So for a juror who is a lay person, they don't have a legal background. For them to be able to decide what is Lascivious, that instruction was not clear on what Lascivious exhibition was. And the two requests that the defense had that were denied, they were correct statement of law. They were not redundant. They were, the omission of those instructions prevented the defense from a proper defense, the defendant from a proper defense. And it was an issue, it was an issue before the jury. So we feel like that the court erred in denying because the government's position is that it was redundant. And I don't see in the judge's instructions to the jury where that is covered. So I don't feel like it was redundant. Thank you, Mr. Holmes. I'm going to give you your whole, excuse me, full five minutes for rebuttal because you were answering the court's questions. Mr. Krishna. Thank you, Your Honor. May it please the court, Praveen Krishna for the United States. Unless this court would prefer otherwise, I'll begin responding to the issue about the tapes and then the Lasciviousness instruction. So I think as this court's questions are made clear, the plain language of the warrant covers these videotapes. And I'd also like to respond to a point my friend just made suggesting that at the time that the agents were reviewing these tapes, they somehow knew conclusively that these tapes were being used at the clinic. And that just isn't the case. I mean, one of the main reasons why the agent wanted to look at these tapes was that the DEA warrant itself relied on surveillance. And it saw a whole lot of patients at odd hours of the day in the parking lot coming and going. And these were sorts of characteristic traits of a pill mill. And there was a suspicion that these could be security footage that would further corroborate the pill mill allegations that the government was investigating. And at the time of the execution of this warrant, there was absolutely no reason to suspect that Dr. Moon was involved in any production of child pornography whatsoever. There's no reason to look at these tapes other than to see if they have any relevance to the health care crimes that the DEA is investigating. What about the argument that opposing counsel has made that the use of VHS tapes to document any kind of surveillance footage is so outdated that that is an absurd proposition, and I'm paraphrasing, for anybody to think that these would in fact be anything related to surveillance videos? Sure. I just don't think that there's anything in the record that would suggest that at the time that the agents are executing this warrant, their knowledge of the technology is anywhere near that definitive. I mean, the agents are executing, one agent is reviewing the tapes while other agents are carrying out other searches. I mean, there's just simply nothing in the record to suggest that after everything is all said and done, an agent decides to sit and look through dozens of tapes that he knows have nothing to do with the crimes he's investigating. And in fact, there was a VHS machine there to enable them to view quickly these tapes. That's right. And that's right. And I mean, after all these tapes are in the clinic, it's reasonable to think that they have some relationship to the workings of that clinic. Was it reasonable for the agent to continue viewing tapes after finding nothing? Go through 15 tapes, it's all family vacations and things like that. It was, Your Honor, because after all, especially if he's only looking at each for a minute, he doesn't know whether or not any particular tape is going to have relevant evidence or not. I mean, in the same way that if you're going through a file cabinet, there might be some things that are clearly irrelevant, but if the file cabinet has hundreds of documents, it's still justifiable to go through a brief review of each document to see whether anything is material to the crime at hand. And as I understand the record, the tapes weren't marked in any way. Is that right? I think that's right. I mean, there was nothing, there was no reason for agent, for agent, for the agent to believe that these tapes were categorically irrelevant. And again, at the time, because he had no reason to suspect Dr. Moon of any other crimes, it really wouldn't make a whole lot of sense for the agent to choose to spend his time watching these videotapes. If there are no other questions, I'll move to the lasciviousness instruction. Did the agent testify it was only a minute he watched the videotape? Yes. At trial, he testified that it was just about a minute per tape. Per tape, all 15? Yes. And that he stopped once he saw something? That's right. That's right. And so the lasciviousness instruction, there was no abuse of discretion in the court's modified version of the pattern jury instruction. Now, this court has made clear in Holmes that the subjective intent of the producer of an And the instruction here tethers that consideration to the context and the setting of the images. And the court instructed the jury that they have to consider the images themselves. So the instruction didn't permit this freewheeling inquiry into Dr. Moon's possible attitudes towards children as a general matter. And in fact, there's really nothing in the record about his predilections towards children other than these videotapes. There's nothing else that's unconnected to the tapes to suggest that he has any sort of an interest in children. And so the lasciviousness of these images is first and foremost dictated by the tapes themselves. And so there's just no basis for a new trial on the instruction that was provided. Let me ask you a question that neither party addressed in the briefs. The district court gave different instructions for lascivious exhibition for counts one and four. And in those instructions, the court said, because what constitutes forbidden lascivious exhibition is not concrete, the lascivious nature of visual depictions should be determined with respect to the actual depictions themselves. Should we consider that instruction when we're evaluating this issue? Yes. I mean, I think that the instruction that is being challenged was the instruction also for one and four about, which includes that language about considering the images themselves and the language that the defendant requested. And so I think that that would be part of, especially given that Dr. Moon hasn't made a separate count-by-count challenge. Your understanding is he's challenging all the jury instructions on lasciviousness. Is that right? My understanding... I wasn't clear on that. So I'm just asking you. Sure. I mean, and I think that that is what I understood that to mean. Okay. That's right. And in fact, the language that Judge Pryor just read was language that was requested by the defendant that the judge accepted. That's right. That's right. And that appeared for one and four, but not for two and three. But either way, even the pattern jury instruction itself, I think, sufficiently addresses Dr. Moon's concern about the role of the defendant's intent in determining what's lascivious and what isn't. So was the full pattern instruction given? Yes. Without modification? The modification was the district court added something at Dr. Moon's behest about saying that you have to consider the images themselves. And that is not... What she just read. That's right. Okay. So, unless this court has any further questions, we ask that you affirm the conviction below. Thank you. Thank you. So in response to the government regarding why would they spend their time looking at VHS tapes when they were conducting an investigational appeal? I mean, why would they spend the time to do this? Well, we had 50 agents in a small clinic that had been there, per the record, in excess of four hours before they went into this office. Exploratory rummaging? They had nothing else to do. They are agents on this like somebody kicked an ant bed. They're everywhere. So the fact that they are looking for something to do is not surprising. And your honors asked the question about the jury instruction that was actually given to the jury on whether or not you should consider the actual depiction itself. And that instruction, I think, should be considered because that falls in line with Holmes, with every case that this court has heard, is there has to be some overt action other than just the mere catching of a video. And these videos, I hope the court has viewed, and I know you've read the briefs, but these are not shocking videos. The camera was set up out in a hallway, unlike Holmes where they were set up in a shower or at waist height under a vanity or undercover like in sport. There were things that were done, an overt act that was done by the defendant in those cases that are not present in this case at all. So ... I'm not following what you mean. It was set up in a hallway. Hallway where? In a home? Yes, your honor. Yes, your honor. In a hallway just pointing towards what? Pointing towards an area of the house that captured the restroom. And there was testimony in the trial. So it was in the hallway, but it was pointed towards the capture of what happened in the restroom. Well, one of our biggest ... Yes or no? I mean, you go on about the hallway, but it was in the hallway. We don't know, your honor, because this was one of the things and ... Well, we do know because we know what's on the tapes. So I'm asking you, is pictures on the tapes from the restroom? They're angles from the restroom, your honor, yes. And they're filming people, children, while they're in the restroom, is that right? Some of it. This is all less than one minute, but some of it does capture that for certain. Okay. And one of our ... Well, I know the tape's running, so it's more capturable than just the bathroom, right? Sure. Well, this is off the record of ... I don't want to know anything off the record. Okay. So, one, the government never went to the house, to the crime scene, to see where these cameras were set up, in fact. So we don't know where these cameras were set up. That is a very big issue, the fact that they can't sit here and say they were set up in the bathroom, towards the bathroom. We don't even know what kind of camera it was. They alleged that it was a boom box. Well, boom boxes get moved. So we don't know where the camera was set up. These are depictions and videos that were captured from cameras that we don't even know what they are. So for them to say that this was set up in a bathroom, it was not set up in a bathroom. Unlike homes. There were no cameras set up under the vanity, waist high, to capture. There was no focusing in and out on the pubic area. There's tremendous differences in these, tremendous. So, as far as the jury instruction that the defense requested, if viewed in its totality, our issue is that none of the instructions clarify that the defendant's belief can't be the sole basis to make it lascivious. And the defense asked the court and actually filed a motion for a pretrial determination on the definition of lascivious months before trial. And the court entered an order saying, I will get you an answer to this request well in advance of trial. That was minutes before she charged the jury. So, this was an issue that was considered and concerned the defense months before trial started. And the trial court said, I'm going to get you an answer. That answer was not due. As was the pattern charged. Yes, Your Honor, but she informed the parties that she was going to enter an order well in advance of trial, laying out her ruling on what it would be. So, we feel like this was a concern that the defense contemplated well before trial. This could have been ironed out and may become some different outcome if the court would have conducted a hearing and actually entered an order as she said that she would. Thank you, Mr. Holmes. We understand your argument.  My pleasure. Thank you. Thank you. Our next case is number 20.